UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE KAPLAN

------------------------------------------------X

HAN SHIPPING INC.,

                 Plaintiff,

    - agains: -

DONALD LINE LTD.,

                 Defendant.

------------------------------------------------X

**07 CIV 9529**

ECF CASE

OCT 2 5 2007

U.S.D.C. S.D.N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiff, HAN SHIPPING INC., (hereafter referred to as "HAN" or "Plaintiff"), by and

through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against

the Defendant, DONALD LINE LTD. ("DLL" or "Defendant"), alleges, upon information and

belief, as follows:

      1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves a

maritime tort and indemnity arising from the collision of motor vessels as more fully described

below. This matter also arises under the Court's federal question jurisdiction within the meaning

of 28 United States § 1331.

      2.     At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity, organized under, and existing by virtue of the law of St. Kitts and Nevis,

and was at all material times the owner of the motor vessel "HAN."

      3.     Upon information and belief, Defendant DLL was, and still is, a foreign

corporation, or other business entity, organized under, and existing by virtue of foreign law with

a place of business at 3rd Floor, 111 Charterhouse Street, London, England and was at all material times the owner of the motor vessel "ALIOS ARTEMIS."

4.      On or about May 29, 2006 the vessel "HAN", carrying a total of 3,500.45 metr : tons of metal, departed from Bartin, Turkey where her cargo was loaded, bound for Casablanc . Morocco.

5.      On or about June 1, 2006 the vessel "ALIOS ARTEMIS" departed from Agiou Theodorous in Corinth bound for the port of Linoperamata located in Irakleio, Crete.

6.      At or about 1:58 p.m. on June 1, 2006 the vessel "ALIOS ARTEMIS" collide with the vessel "HAN" in international waters approximately 18 miles south of the Island c Hydra, Greece causing the HAN to sink a few minutes after the collision. The HAN and a cargo contained carried thereon were lost as a result of her sinking. In addition, several HA? crew members tragically lost their lives at sea as a result of the sinking.

7.      Upon information and belief, at no time prior to colliding with the vessel "HAN" did the vessel "ALIOS ARTEMIS" undertake any measures to avoid colliding with the vessel "HAN."

8.      Upon information and belief, the vessel "ALIOS ARTEMIS" failed to maintain a safe and proper watch for other vessels such as the "HAN" which constitutes a failure to abide and obey the International Regulations for Preventing Collisions at Sea ("COLREGS").

9.      Upon information and belief, the vessel "ALIOS ARTEMIS" was otherwise negligent in that it failed to avoid the collision.

10.      Based on the foregoing, the Defendant is liable to the Plaintiff for all losses and damages sustained by the Plaintiff as a result of the aforesaid incident.

2

11.     This action is brought in order to obtain jurisdiction over DLL and obtain securi
for HAN's claims and in aid of proceedings filed against DLL in the English High Court[1].

12.     DLL has commenced a 'Negative Declaratory Action' action in the Multi
Member Court of First Instance of Piraeus against Plaintiff, et al, seeking a determination that i
bears no responsibility or liability towards Plaintiff or that any such responsibility or liability be
limited.

13.     Plaintiff denies that the Greek courts have proper jurisdiction over the dispute.
Plaintiff is based in Turkey, Defendant is based in England and the collision occurred in
international waters. Greece has no interest or connection to the subject dispute.

14.     Plaintiff asserts that jurisdiction over the subject dispute is proper in either
England, where it has commenced an action, or in Turkey. Plaintiff's action commenced in
England is currently stayed pending the outcome of the Greek proceedings to which, as is noted
above, Plaintiff contests jurisdiction.

15.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party
under English Law. As best as can now be estimated, Plaintiff expects to recover the following
amounts in the English High Court proceeding as the prevailing party:

      A     Principal Claims

| | | |
|---|---|---|
| i. | Loss of M/V Han | $1,600,000[2]; |
| ii. | Loss of use of M/V Han | $500,000[3]; |
| ii. | Indemnity for cargo claims | $1,309,702.25[4]; |

---

[1] Please see annexed as Exhibit 1 hereto the Claim Form filed by Plaintiff in the English High Court of Justice.

[2] Please see annexed hereto as Exhibit 2 the Valuation Certificate for the M/V Han.

[3] It is standard Admiralty practice in England to allow for three (3) months loss of use at the vessel's going charter rate in the case of total loss claims. As best as may be presently estimated Plaintiff has sustained a loss of $500,000 based on the loss of charter hire that would have been earned over the ensuing three (3) months but for the loss of the M/V HAN.

[4] Please see annexed hereto as Exhibit 3 a free translation of the Writ of Action filed in the Multi Member Court of First Instance of Piraeus by the subrogated insurance underwriter for the cargo interests.

3

| B | Estimated interest on claims<br>4 years at 8.0% compounded quarterly | $914,624.65; and |
| C | Estimated attorneys' fees and expenses | $1,000,000. |
| **Total:** | | **$5,324,326.90.** |

16. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

17. The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B. That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies,

4

tangible or intangible, or any other funds up to the amount of **$5,324,326.90** belonging to, due o

being transferred to, from, or for the benefit of the Defendant, including but not limited to such

property as may be held, received or transferred in Defendant's name or as may be held, receive

or transferred for its benefit at, moving through, or within the possession, custody or control of

banking/financial institutions and/or other institutions or such other garnishees to be named, and

that all persons claiming any interest in the same be cited to appear and pursuant to Supplement:

Admiralty Rule B answer the matters alleged in the Complaint;

     C.     That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof;

     D.     That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court;

     E.     That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

     F.     That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:     Southport, CT
           October 25, 2007

                       The Plaintiff,
                       HAN SHIPPING INC.

                       By:

                       Kevin J. Lennon
                       Nancy R. Peterson
                       LENNON, MURPHY & LENNON, LLC
                       420 Lexington Avenue, Suite 300
                       New York, NY 10170
                       (212) 490-6050 - phone
                       (212) 490-6070 - facsimile
                       kjl@lenmur.com / nrp@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut   )
                       )    ss.:    Town of Southport
County of Fairfield    )

1.   My name is Kevin J. Lennon.

2.   I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.   I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the

Plaintiff.

4.   I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.   The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.   The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.   I am authorized to make this Verification on behalf of the Plaintiff.

Dated:     Southport, CT
           October 25, 2007

                                          Kevin J. Lennon

6

# EXHIBIT 1



**Claim Form**
**(Admiralty claim)**

In the High Court of Justice
Queen's Bench Division
Admiralty Court

| | for court use only |
|---|---|
| Claim No. | 2006 Folio 542 |
| Issue date | |

Claimant(s)

The Owners of the Motor Vessel "HAN"



Defendant(s)
Donald Line Limited

Name and address of Defendant(s) receiving this claim form

Donald Line Limited
Third Floor
111 Charterhouse Street
London
EC1M 6AW

The court office at the Admiralty and Commercial Registry, Royal Courts of Justice, Strand, London WC2A 2LL, is open between 10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

ADM1A Claim form (admiralty claim) £05.07 ;

Claim No.

### Brief details of claim

This is a claim for damages against Donald Line Ltd, the Owners of the Ship "ALIOS ARTEMIS", arising out of a collision between the Motor Vessel 'HAN" and the Motor Tanker "ALIOS ARTEMIS" on 1st June 2006 in approximate position latitude 37.10N longitude 23.49E, together with interest thereon pursuant to statute and costs.



Particulars of claim (Not Applicable CPR 61.4(2))

### Statement of Truth

*(I believe)(The Claim ant believes) that the facts stated in this claim form *(and the particulars of the claim attached to this claim form) are true.

* I am duly authorised by the claimant to sign this statement

Full name _____ Michael Ellis _____

Name of *(claimant)('s solicitor's firm) _____ Winter Scott _____

signed. _____                      position or office held Partner
*(Claimant)('s solicitor')                  (if signing on behalf of firm, company or corporation)

*delete as appropriate

Winter Scott
19-21 Great Tower Street
London EC3R 5AR

DX: 518 London /City

Tel: 020 7648 2460
Fax: 020 7626 5591
Ref: KCS/MRE/nas/78/102

Claimant's or solicitor's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

# EXHIBIT 2



# C.W. KELLOCK & CO. LTD

A member of the Eggar Forrester group

First Floor, Scotia House, 33 Finsbury Square, London EC2A 1PL, England
Telephone +44-20-7256-2623  Fax +44-20-7382 7706  kellock@eggarforrester.com
www.shipauctions.com    www.shipvaluations.co.uk

FOUNDED 1820
BROKERS AND APPRAISERS TO THE MARSHAL OF THE ADMIRALTY

05 June 2006

## Valuation Certificate

Barlow Lyde & Gilbert
Beaufort House,
15 St.Botolph Street,
London EC3A 'NJ.

For the attention of Mr Chris Zavos

### m/v 'HAN' ex Pedernales
### IMO Number 7634044 about 3750 dwt built 1978, Spain. Single box hold. 216 teu.
### Special survey recently passed.

We have considered as requested the market value of the above vessel. From such information as we have available, taking into account similar vessels which have been sold and which have been offered for sale, we consider the vessel's value on 1st June 2006 to have been in the region of

**US$ 1,300,000 (one million three hundred thousand) if burning Marine Diesel Oil**

or

**US$ 1,600,000 (one million six hundred thousand) if burning Intermediate Fuel Oil**

This valuation has been carried out on the basis that the vessel was in sound trading condition, fully equipped and with class maintained, as between a willing buyer and a willing seller. Our usual valuation conditions below apply.

Yours faithfully
For and on behalf of
C.W. Kellock & Co. Ltd.

Director

Valuations are given by us subject to the following conditions:

1. The Valuation relates solely to the date/place referred to and we emphasise that it is a statement of our opinion only, and is not a representation of fact or of the correctness of the particulars or information available to us upon which our opinion is based.
2. All particulars detailed are from information given to us and such other information as we have been able to obtain from the relevant works of reference in our possession, but we can accept no responsibility for their accuracy. We have not made a physical inspection of the vessel, nor have we inspected the vessel's classification records.
3. The Valuation is solely for the information of the person instructing us, but if he intends to act upon this Valuation he should first satisfy himself by inspection of the vessel or otherwise as to the correctness of the particulars given.
4. Unless otherwise stated the vessel is assumed to be free of charter commitment and freely transferable.

# EXHIBIT 3

## BEFORE THE MULTIMEMBER COURT OF FIRST INSTANCE OF PIRAEUS
### (Division of Maritime Disputes)

### WRIT OF ACTION

The insurance company with the name "AXA ASSURANCE MAROC", having her registered office in Casablanca, Morocco (120 Avenue Hassan II, Casablanca 2000, Morocco) as it is legally represented.

### AGAINST

1. The company with the name "DONALD LINE LIMITED", legally represented, and having her registered office, officially in accordance with her memorandum of association in London, Great Britain but actually in Piraeus (Efplolas str., no. 8-10), where the company is administered and her business activities originate and where the companies managing, representative and legal representative company with the name "KYLA SHIPPING COMPANY" is registered also being legally represented.

2. The company with the name "HAN SHIPPING INC.", having her registered office, officially in accordance with her memorandum of association on Nevis Island, but actually in Constantinople, Turkey (48-1, Koybasi Caddesi, Yenikoy Mah. Sariyer, Istanbul, Turkey), being legally represented.

3. The company with the name "GENTA GENEL TASIMACILIK DENIZCILIK VE TIC" having her registered office in Constantinople, Turkey (48-1, Koybasi Caddesi, Yenikoy Mah. Sariyer, Istanbul, Turkey), being legally represented.

4. Menelaus Gogiannou son of Ioannis, residing in Ano Liosia, Attica, (1 Iasonos str.).

5. Ioannis Grigoropoulos son of Constantine, residing in Palaio Faliro, Attica, (12 Euklidou str.).

..............................

### A.    The litigants

1

1. We are a Moroccan insurance company which is a member of the multi-national group of insurance companies "AXA" and which under the circumstances described below, insured for all risks of sea transport a cargo of metal which was transported from Turkey to Casablanca on the Panamanian flagged ship "HAN."

2. The first defendant is and at the time of the incident was the shipowning company of the Greek flagged tanker "ALIOS ARTEMIS" which under the circumstances described below collided on the 1.6.2006, with the Panamanian flagged vessel "HAN" close to the island Hydra, leading to the sinking of the latter.

3. The second defendant is and at the time of the incident was the shipowning company of the Panamanian flagged vessel "HAN", which as above and under the circumstances which shall be described herein collided on the 1.6.2006 nearby the island Hydra, with the above named Greek vessel owned by the first defendant, leading to the sinking of the vessel and her cargo.

4. The third defendant is a Turkish shipping company which is active in the fields of shipowning, chartering, management and generally ship exploitation. The third defendant having a shareholding and/or economic interest in the ownership of the vessel "HAN", which is formally owned by the second defendant, but which was exploited (from the date of purchase in 2004 and until her sinking) by this company as her actual owner, collecting all profits and earnings from the vessels management and assuming all responsibilities deriving from her exploitation.

Additionally, the third defendant together with the second had undertaken, vis a vis the companies insured by us, being the receivers and owners of the cargo, the obligations of a contractual sea carrier and particularly the contractual obligation to transport from Turkey to Morocco the cargo of metal insured by us, which was carried on the "HAN".

5. The fourth and fifth defendants were at the time of the incident crew members of the Greek vessel "ALIOS ARTEMIS" owned by the first defendant, serving as Master and second officer respectively. Specifically the fifth defendant was at the time of the collision of the two vessels the officer on watch on the bridge of the Greek vessel. Criminal charges have been filed, against the above two defendants, by the

2

Prosecutor of the First Instance Court of Piraeus, and at the time the present was being written the case was at the stage of main investigations.

## B.    Facts

1. In accordance with the contract of sale dated May 2006, between the Turkish company with the name "KIBAR DIS TICARET A.S." being the seller and the company "SOCIETE DE CONSTRUCTION CHAOUIA" (hereforth "CHAOUIA") having her registered office in Casablanca, Morocco, being the buyer, it was agreed that the first would sell to the second and the second agreed to buy from the first a total of 988,450 metric tons of metal in the shape of rods of varying sizes under the terms CFR (cost and freight) as follows:

- 89 packages of metal rods having a flat cross section, weighing 172.650 metric tons, worth 515 US$ per ton and in total amounting to 88,914.75 US$.
- 177 packages of metal rods having a square cross section, weighing 338,950 metric tons, worth 510 US$ per ton and in total amounting to 172,864.50 US$.
- 129 packages of metal rods having a circular cross section, weighing 248.150 metric tons, worth 510 US$ per ton and in total amounting to 126,556.50 US$.
- 118 packages of metal angle bars, weighing 228.700 metric tons, worth 510 US$ per ton and in total amounting to 116,637 US$.

In total amounting to 504,972.75 US$ (hereforth to be referred to as the "first batch").

Also in accordance with the sale contract dated May 2006 between the above named Turkish company, being the seller and the company with the name "OCID METAL SARL (hereforth "OCID METAL") having her registered office in Casablanca, Morocco, being the buyer, the first agreed to sell to the second and the second agreed to buy from the first a total of 1,573.300 metric tons of metal rods of varying sizes under the terms CFR (cost and freight) as follows:

- 286 packages of metal angle bars, weighing 556.150 metric tons, worth 510 US$ per ton and in total amounting to 283,636.50 US$.

3

- 2°2 packages of metal rods having a flat cross section, weighing 469.300 metric tons, worth 515 US$ per ton and in total amounting to 241,689.50 US$.

- 2°4 packages of metal rods having a square cross section, weighing 448.400 metric tons, worth 510 US$ per ton and in total amounting to 228,684 US$.

- 51 packages of metal rods with a circular cross section, weighing 99.450 metric tons, worth 510 US$ per ton and in total amounting to 50,719.50 US$.

In total amounting to 804,729.50 US$ (hereforth to be referred to as the "second batch").

2. In accordance with the above contracts of sale, the selling company "KIBAR DIS TICARET A.S" chartered from the third defendant the Panamanian flagged ship "HAN" (CRT:2453, Call Sign: H9XI), in order that the above mentioned quantity of metal be transported from Turkey to Morocco and be delivered to and received by the above two mentioned purchasing companies.

3. Then, the above selling company, acting as shipper, on or around the 29.5.2006, loaded on the vessel "HAN" which was located at the Turkish port Bartin, amongst others the above quantities of cargo (988.450 and 1,573.300 metric tons) for her transportation from the above named Turkish port to Casablanca in Morocco. The shipper also loaded on the same vessel 938.700 metric tons of metal owned by another receiving company.

As proof of shipment the third defendant being the contractual carrier issued two "CONBILL 1948" bills of lading, numbered 1/29.5.2006 and 2/29.5.2006 (for the above two batches of cargo respectively) which cited as carrier the above Turkish company "KIBAR DIS TICARET A.S.", as "receiver" they stated "to the order of........." and under the heading "address for notification" the first bill of lading stated the receiving company "CHAOUIA" and the second bill of lading the receiving company 'OCID METAL'. It should be noted that the third defendant appears in the bills of lading as the "carrier".

As a consequence of the above shipment and the issuance of the bills of lading the latter were signed by the third defendant in her capacity of carrier of the cargo and were endorsed on the 29.5.2006 by the Turkish company as seller/shipper and were delivered to the above purchasing/receiving companies which thus became the legal

4

holders of the bills of lading and owners of the cargo carried under them, or in other words the bearers of the risk of loss of the above cargo, and were consequently entitled to receive such cargo.

4. On or around the 29.5.2006 the vessel "HAN" carrying a total of 3,500.45 metric tons of metal, including the batches weighing 2,561.75 metric tons in total, sailed from the port of loading in Bartin, Turkey for the port where the cargo would be unloaded i.e. for Casablanca, Morocco.

At the time of sailing the above vessel "HAN" was manned with a crew of 13 sailors including the master.

5. On or around the 1.6.2006 the Greek flagged tanker "ALIOS ARTEMIS" (Piraeus ship registry number 11383, GRT: 2129, Call sign: SVAB) owned by the first defendant, sailed from the anchorage of Agious Theodorous in Corinth, fully loaded with fuel, for the port of Linoperamata in Irakleio, Crete.

At the time of sailing the vessel was manned by a ten member crew including the fourth and fifth defendants. During the crucial time period the fourth defendant, Menelaos Gogiannou was the master of the vessel (Seamen's Register number 2714 DST).

6. On or around 11:39 on the 1.6.2006 the vessel "ALIOS ARTEMIS" oversaw the islet Petrokaravo from a distance of 1.7 miles and altered course towards the west of the island Milos intending to sail west of the cape Paximadi from a distance of approximately 4.5 miles.

After a short while at around 12:00 the fifth defendant Ioannis Grigoropoulos who was the second officer assumed watch on the bridge of the vessel.

The weather conditions during the whole time period when the fifth defendant was on duty as navigation officer and thereafter during the crucial time period were good, with good visibility and calm waters. From the time the vessel oversaw the islet Petrokaravo her speed was on average about 13.73 knots per hour.

7. At about the same time when the fifth defendant – second officer had assumed the navigation of the vessel, the vessel "HAN" with a course of approximately 211°,

5 .

meaning it would be 2 or 3 miles east of Cape Malea, oversaw the islet Ag. Georgios from the right side and from a distance of approximately 4.5 miles.

8. From the time the fifth defendant – second officer assumed duty on the bridge of the vessel "ALIOS ARTEMIS" and during the whole crucial time period thereafter the courses of the two vessels were converging (the angle of convergence was approximately 61°).

9. Even though visibility was extremely good and each navigation officer would be able to see the other vessel with a naked eye from a relatively great distance of 8 – 10 miles, they in fact became aware of each other from a relatively small distance of 2 – 3 miles.

The fact that the officers on watch on both vessels delayed becoming aware of the presence of the other vessel can be attributed partially to the fact that there were no look-out men on the bridges of both vessels even though this is obligatory under the regulations and in accordance with good shipping practice.

A couple of minutes before 14:00 the fifth defendant – second officer of the vessel "ALIOS ARTEMIS" became aware (with a naked eye) of the presence of the vessel "HAN". In particular he became aware that the "HAN" was sailing to the left of the "ALIOS ARTEMIS" with a converging course of approximately 61°.

At about the same time the officer on watch on the "HAN" also became aware with a naked eye, that the "ALIOS ARTEMIS" was sailing to her right side, with a converging course of approximately 61°.

The average speed of the "HAN" was less than the average speed of the "ALIOS ARTEMIS" i.e. it was approximately 8 knots.

10. After each of the above vessels became aware of the other and during the whole period thereafter, the directions of the vessels and in particular the bearings of the "ALIOS ARTEMIS" from the bridge of the "HAN" and that of the "HAN" from the bridge of the "ALIOS ARTEMIS" were practically unaltered, meaning that the vessels were on a course which would lead to their collision if they continued to hold this course and/or speed thus as a consequence there was an imminent danger of collision.

6

11. Despite the fact that the vessels were gradually converging and were coming closer to each other and the danger of collision was actually visible, neither of the two ships conducted a methodical analysis of the navigational data, i.e. of their respective courses and speed, either by visual observation or by the use of nautical instruments and especially the use of binoculars and radar. As a consequence of the inefficient visual observation and the failure to use the available nautical instruments and appliances both vessels failed to become aware, up until the crucial moment that they were on a course to collide and that it was imperative that they take measures, in accordance with the regulations pertaining to the avoidance of collisions and the commands of good nautical practice.

12. At about 13:58 on the 1.6.2006 the vessels holding the above courses, violently collided at latitude= 37° 10.9'N and longitude= 23° 49,2'E and as a result the vessel "HAN" sunk a few minutes after her collision thereby totally loosing the cargo it was carrying.

13. Only twenty (20) seconds prior to the collision the vessel "HAN" "held" her engines but did not alter her speed, and the fifth defendant – second officer of "ALIOS ARTEMIS" did not proceed with any deterrent manoeuvres and as a result the other vessel was rammed.

## C. The liability of each vessel

1. According to the facts as described above the collision of the two vessels is a result of the faulty omissions of the two officers on watch (the officers on watch on the "ALIOS ARTEMIS" and the "HAN").
Particularly:

2. As the collision occurred in "open" waters the 1972 International Regulations for Preventing Collisions at Sea which have been ratified in Greece under Legal Decree 93/1974 are applicable.

In particular and under the circumstances the vessels had a duty to comply with the provisions of the following regulations, which are set out below.

*"Rule 2. Responsibility*

7

(a) Nothing in these Rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

...

### Rule 5. Look-out

Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

### Rule 7. Risk of collision

(a)  Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists.  If there is any doubt, such risk shall be deemed to exist.

(b)  Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

...

...

(d)  In determining if risk of collision exists the following considerations shall be among those taken into account:

(i)  such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change,

(ii)  such risks may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

### Rule 8. Action to avoid collision

(a)  Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

...

### Rule 13. Overtaking

(a)  Notwithstanding anything contained in the Rules of this Section any vessel overtaking any other shall keep out of the way of the vessel being overtaken.

8

(b) A vessel shall be deemed to be overtaking when coming up with another vessel from a direction more than 22.5 degrees abaft her beam, that is, in such a position with reference to the vessel she is overtaking, that at night she would be able to see only the stern light of that vessel but neither of her sidelights.

(c) When a vessel is in any doubt as to whether she is overtaking another, she shall assume that this is the case and act accordingly.

(d) Any subsequent alteration of the bearing between the two vessels shall not make the over aking vessel a crossing vessel within the meaning of these Rules or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

### Rule 16. Action by give-way vessel

Every vessel which is directed by these Rules to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear.

### Rule 17. Action by stand-on vessel

(a)(i) Where by any of these Rules one of two vessels is to keep out of the way the other shall keep her course and speed.

(ii) The latter vessel may however take action to avoid collision by her manoeuvre alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

(b) When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.

(c) A power-driven vessel that takes action in a crossing situation in accordance with sub-paragraph (a)(ii) of this Rule to avoid collision with another power-driven vessel shall, if the circumstances of the case admit, not alter course to port for a vessel on her own port side.

(d) This Rule does not relieve the give-way vessel of her obligation to keep out of the way."

3. In particular both vessels failed to:

(a) to enforce the above regulations and to adhere by the commands of good seamen's practice (rule 2),

(b) to maintain an effective look out and to use nautical equipment and appliances available and especially to use the binoculars, the radar and the VHF in order to be

9

able to communicate and to come to an agreement which would enable the safe overtaking of the other vessel (rules 2(a) and 5).

(c) to evaluate the data available as well as the respective course and speed of each vessel in order to assess whether a danger of collision exists (rule 7).

(d) To undertake deterrent manoeuvres, drastic changes in the course of the vessel and to reduce speed (rule 8).

4. In particular, the vessel "ALIOS ARTEMIS" failed to observe that she was approaching the vessel "HAN" from a direction more than 22.5 degrees abaft her beam, i.e. failed to observe that for the purposes of Rule 13 the "ALIOS ARTEMIS" was an overtaking vessel and the "HAN" was a vessel being overtaken.

If she had made this observation as she had a duty to then she should have acted as the "give-way" vessel for the purposes of Rule 16 whereas the "HAN" being for the purposes of Rule 17 the stand-on vessel should have maintained her course and speed.

However, even if the Court were to find that, for the purposes of Rule 16, the "HAN" was the give-way vessel, the "ALIOS ARTEMIS" would still have had a duty to take deterrent action in accordance with Rule 17(b) if she had observed, as she ought to have, that the collision could not have been avoided only by the actions of the "HAN".

5. Under these circumstances the vessel "ALIOS ARTEMIS" is 80% liable in relation to the above omissions which are causally connected to the collision of the vessels, whereas the "HAN" is 20% liable.

Alternatively, if it were held that the positioning of the vessels was not such as to fall within Rule 13, i.e. that the "ALIOS ARTEMIS" was not an overtaking vessel, then she is 50% responsible with regard to the remaining faulty omissions, mainly as a result of the omission to take deterrent action as the stand-on vessel in accordance with the provisions of Rule 17(b) and subsequently the "HAN" is also 50% responsible with regard to the above faulty omissions which are causally connected to the collision.

6. Furthermore, the fifth defendant, second officer of the "ALIOS ARTEMIS" is liable as he was responsible for the navigation of the vessel since he was the officer on

10

watch during the crucial time period and is thus liable in relation to all of the above omissions.

The fourth defendant – Master of the "ALIOS ARTEMIS" is liable as he was generally in charge of the vessel and failed to be on the bridge of the vessel in accordance with the commands of good seaman's practice since the particular area is very busy and the courses of vessels cross each other.

7. The second and third defendants are responsible in accordance with the above because of the result of the collision which was the sinking of the vessel "HAN" and which in turn lead to the loss of the cargo carried. The second defendant is liable as the shipowner and the third as the contractual carrier, having issued the bills of lading.

In particular:

The bills of lading which embody, or in other words amount to proof of the contract of carriage between the third defendant and the shipper of the cargo and after their endorsement between the third defendant and the above two receivers, embody as a result of the specific reference made, the 1924 Brussels Convention on the harmonization of rules concerning bills of lading otherwise known as the Hague Rules (enacted in Greece via Law 2107/1993). Furthermore, in all other respects the above carriage contracts make no provision concerning applicable law and are thus governed by Turkish law as the law of the place where the carrier (in this case the third defendant) has its registered seat and is also the place of loading or unloading (under these circumstances the place of loading, being Bartin in Turkey) (article 4 par. 4 of the 1980 Rome Convention of the law applicable to contractual obligations; enacted in Greece by means of law 1792/1988).

In accordance with the Hague Rules, as these have been enacted and are enforced under Turkish law, the (contractual) carrier is responsible for the loss of or damage to transported cargo if the carrier has not demonstrated the required diligence to ensure the vessel is seaworthy before or at the commencement of the agreed voyage (article 3.1 Hague Rules). Moreover, "the carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried" (article 3.2 Hague Rules).

11

The liab lity referred to above is strict given that the carrier bares the burden to prove, that the required diligence was exercised before and at the commencement of the voyage and that the goods carried were properly and carefully loaded, handled, stowed, carried, kept, cared for and discharged (article 4.1). Thus the carrier is always liable except if proven that the necessary diligence was exercised on his behalf to render the vessel seaworthy and provided it is proven that the goods carried were delivered to the receiver in the exact condition they were delivered by the shipper for their carriage. In particular in case the goods are not delivered to the receiver (or such are delivered in a different state or quantity than they were received for carriage), the carrier is always liable except if he proves that the failure to deliver (or delivery of the goods in a damaged or deficient condition) is attributable to one of the exceptions from liability or limitations of liability as these are provided for under the Hague rules (article 4.2)

Furthermore, the carriers' liability, as described above is also non-contractual. Meaning that the actual carrier, who is not contractually bound with the shipper or the receiver of the goods, is liable to the same extent and according to the same criteria as the contractual carrier for the reason that he executed the particular carriage, even if he was not the one to issue the bills of lading. For this reason the actual carrier is entitled to invoke the same exceptions and limitations to liability which the contractual carrier is entitled to invoke under the above Rules.

Consequently, in accordance with the above and the Hague Rules applicable to bills of lading and Turkish law applicable to the particular contracts of carriage, the second and third defendants are jointly and severally liable, contractually and/or non contractually, for the loss of the cargo, being the contractual and/or actual carriers, since they undertook as a result of the carriage contracts to load, handle, stow, carry, keep, care for, and discharge in the required manner the cargo. However, they breached this obligation since they did not complete the carriage and they did not deliver the cargo to her legal receivers.

## D.    The consequences of the loss of the "HAN", the damage of the insured and our subrogation to their rights.

1. Due to the sinking of the second defendants vessel, the "HAN", a total loss of the cargo of metal was sustained (513 packages or 988,450 metric tons and 813 packages or 1,573.300 metric tons), cargo which under the bills of lading numbered 1

12

and 2 and dated 29.5.2006 was to be delivered to the above two receivers, namely the companies "CHAOUIA" and "OCID METAL." Consequently the above two receivers (which as described above had become the legal owners of the cargo or in other words bore the risk of loss of the cargo at the time of the sinking of the "HAN") sustained as a result of the sinking financial loss amounting to the value of the cargo lost, such value amounting to the value of the cargo at the port of destination i.e. Casablanca, Morocco. However, as it is not known what the value of the cargo would have been at the port of destination and at the time the cargo should have been delivered to the receivers (if it had not been lost due to sinking), i.e. on 6.6.2006 (the date on which the vessel "HAN" would have arrived in Casablanca and the unloading of the cargo would have commenced), the value of the cargo is deemed to be as per her invoice, and this amounts to the usual value of goods of the same kind and quality at that given moment in time in Casablanca. It should be noted that the value of the cargo is the same at the port of loading (Turkey), at the port of destination (Morocco) and in Greece.

2. According to the above the financial loss of the above two receivers which is equal to the value of the cargo and was the same on the 1.6.2006 and 6.6.2006 amounts to:

(a) the loss sustained by the company "CHAOUIA" (988,450 mt) in accordance with the invoice numbered 25/075 issued by the seller being the Turkish company KIBAR DIS TICARET amounts to 504,972.75 US$.

(b) the loss sustained by the company "OCID METAL" (1,573.3 mt) in accordance with the invoice numbered 26/076 issued by the above mentioned Turkish company KIBAR DIS TICARET amounts to 804,729.50 US$.

3. Under the insurance contract numbered 20068094 which was signed in Casablanca on 29.5.2006 between us and the insured, here the company "CHAOUIA," our company undertook to insure the first portion of the cargo amounting to 513 packages or 988,450 metric tons of metal, for the sea voyage from Turkey to Morocco, for 6.000.000 Moroccan Dirham. The insurance contract came into force on the 29.5.2006 and was meant to cover the whole sea voyage, until the unloading of the cargo in Casablanca, something which obviously never occurred. The insurance contract covered all possible losses pertaining to the carriage from the port of loading to the port of unloading, including the total loss of the cargo.

13

After the sinking of the vessel "HAN" and the subsequent loss of the cargo, we compensated the insured, namely the company "CHAOUIA" and reimbursed her on the 1.11.2006 with 4.880.000 Moroccan Dirham amounting to 504,972.75 US$, in accordance with our obligations as the insurers and under the terms of the above mentioned insurance contract. The above amount is equal to the value of the cargo at the time of her loss i.e. on the 1.6.2006 and at the time it was meant to arrive in Casablanca, i.e. on 6.6.2006 were it not for the accident.

As a result of this reimbursement we were subrogated to their rights in accordance with Moroccan law which was applicable to the insurance contract (it should be noted that both the insured and the insurer are Moroccan). Moreover, Moroccan law is similar to Greek law with regard to the subrogation of an insurer to the rights of an insured company against any third party and specifically against the defendants for compensation due to the loss of cargo. Alternatively, these rights were assigned to us by the insured in accordance with the terms of the contract of assignment dated 1.11.2006 which is governed as a result of the specific reference made therein by Greek law. Additionally with the present writ of action we are notifying the defendant of the existence of this contract of assignment.

4.    Furthermore, under the insurance contract numbered 20062546 which was concluded in Casablanca on the 5.6.2006 with the company "OCID METAL" the company was insured retrospectively i.e. from the time of the accident. We thus provided insurance coverage amounting to 7,000,000 Moroccan dirham for the sea carriage from Turkey to Morocco in respect of the second portion of the cargo amounting to 813 packages or 1.573.3 metric tons of metal. The particular insurance contract came into force on the 1.6.2006 and would remain in force until the conclusion of the voyage and the unloading of the cargo in Casablanca which was obviously not realized. The insurance contract covered all possible losses pertaining to the carriage from the port of loading to the port of unloading, including the total loss of the cargo.

After the sinking of the vessel "HAN" and the subsequent loss of the cargo, we compensated the insured, namely the company "OCID METAL" and reimbursed her on the 5.2.2007 with the amount of 5.000.000 Moroccan Dirham amounting to 804,729.60 US$, in accordance with our obligations as the insurers and under the terms of the above mentioned insurance contract. The above amount is equal to the

14

value of the cargo at the time of her loss i.e. on the 1.6.2006 and at the time it was meant to arrive in Casablanca, i.e. on 3.6.2006, were it not for the accident.

As a result of this reimbursement we were subrogated to their rights in accordance with Moroccan law which was applicable to the insurance contract (it should be noted that both the insured and the insurer are Moroccan). Moreover, Moroccan law is similar to Greek law with regard to the subrogation of an insurer to the rights of an insured company against any third party and specifically against the defendants for compensation due to the loss of the cargo. Alternatively, these rights were assigned to us by the insured in accordance with the terms of the contract of assignment dated 5.2.200? which is governed as a result of the specific reference made therein by Greek law.  Additionally with the present writ of action we are notifying the defendants of the existence of this contract of assignment.

5. Whereas the value of the cargo:

(a) at the place and at the time of the accident and loss (1.6.2006) was (504,972.50 + 804,729.50) 1,309,702.25 US$, alternatively **1,009,715.71 euro** (according to the equivalence between the US$ and the Euro on the 6.6.2006, i.e. 1 euro = 1.2971 US$).

(b) at the place and at the time it was supposed to have been delivered to the receivers (6.6.2006) it was (504,972.75 + 804,729.50) 1,309,702.25 US$, alternatively **1,002,681.25 euro** (according to the equivalence between the US$ and the Euro on the 6.6.2006, i.e. 1 euro = 1,3062 US$).

6. Whereas the defendants being jointly and severally liable, alternatively severally the first and second defendants to a degree your Court shall decide to be legal, the third and fourth defendants jointly with the first and the third severally or jointly with the second but in any case severally in respect of the first and to a degree your Court shall hold to be legal, owe for the reasons described above and must pay us the value of the carried cargo (a) at the place and at the time of the accident (1.6.2006) as regards to the tortious grounds of our writ of action against the first, second, fourth and fifth defendants, and (b) at the time and place where the cargo should have been delivered (3.6.2006), as regards to the contractual grounds of our writ of action against the third and second defendants.

15

7. Whereas the defendants illegally refuse to pay us the above amount and must be forced to do so by means of a judgment of your Court which must be declared provisionally enforceable due to the commercial nature of the dispute and/or her tortious basis.

8. Whereas your Court is the court of competent jurisdiction and has international jurisdiction to try the present dispute.

Whereas the present writ of action is lawful, substantiated and true.

## FOR THESE REASONS

And without prejudice to any rights we may have

## WE REQUEST

That our writ of action be accepted.

That the defendants be condemned for the reasons described in the present and it be held that they must pay jointly and severally the amount of **1,009,715.71 euro** or alternatively, **1,002,681.25 euro** or alternatively:

(a) the first and second defendants, with distinct liability, by 80% the first and 20% the second, or alternatively by 50% the first and 50% the second, or as your Court deems lawful, with the fourth and fifth defendants jointly and severally liable with the first defendant and to the extent and degree of the first defendant's liability, to pay the amount of 1,009,715.71 euro, and

(b) the third on her own, or alternatively jointly with the second and to the extent and degree the former is found liable and in any case separately with regard to the first, by 20% or by 50% or to the extent you Court shall hold to be lawful, to pay the amount of 1,002,681.25 euro,

And all the above with interest from the date of service of the present and until payment.

16

That the judgment to be issued by your Court be declared provisionally enforceable due to the commercial nature of the dispute and/or her tortuous basis.

That the defendants are condemned to pay legal and court fees and costs.

Piraeus, 1 June 2007
The attorney – at – law

The court hearing may not
take place prior to an attempt
to settle the dispute extra
judicially.
Piraeus, 4-6-2007
the Secretary

## Act of setting a day of hearing

Docket Number : 13
Hearing date : 12 February 2008
Day : Teusday
Time : 10:00
Room : 305

17

KAPLAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

HAN SHIPPING INC.,

Plaintiff,

- against -

DONALD LINE LTD.,

Defendant.

------------------------------------------------------------X

**JUDGE KAPLAN**

**'07 CIV    95 29**

ECF CASE

## ORDER APPOINTING SPECIAL PROCESS
## SERVER PURSUANT TO F.R.C.P. RULE 4(c)

An application having been made by counsel for Plaintiff for an Order Appointing a

Special Process Server pursuant to Rule 4(c) of the Federal Rules of Civil Procedure,

NOW, on reading and filing the Affidavit of Kevin J. Lennon, sworn to on October 25,

2007, and good cause shown having been shown, it is hereby

ORDERED that Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson

or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, including

Gotham Process Servers, be, and is hereby, appointed, in addition to the United States Marshal,

to serve the Process of Attachment and Garnishment and the Verified Complaint, together with

any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon

information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account

of, Defendants.

Dated: New York, NY
        October 15 2007

A CERTIFIED COPY
J. MICHAEL McMAHON,        CLERK

BY _____
        DEPUTY CLERK

_____
U.S.D.J.